TAHIR MAHMOOD v. RESEARCH IN MOTION TAHIR MAHMOOD v. RESEARCH IN MOTION RESEARCH IN MOTION Also, the lack of the district court's consideration of evidence of copying, which Aukerman says must be considered in the context of Latch's determination. And also the district court's, what we would say, not following the law in finding unreasonable delay in the context of summary judgment. So there was a hearing on economic prejudice. The other issues were addressed in the context of summary judgment. So I'll begin by addressing the economic prejudice argument. First, as this court is well aware, there are two kinds of prejudice, evidentiary prejudice and economic prejudice. RIM has always maintained that it has sufficient evidence to defend the claims here in court. There is no evidentiary prejudice in this case. As to economic prejudice, we believe that the district court's decision is based on clearly erroneous factual findings, but also a misapplication of law. The district court's decision is contrary to the long line of this court's precedent in Aukerman, Hemstreet, Gasser Chair, Myers v. Brooks, Myers v. Asics, Hearing Components, and Ecolab. In all of those cases, the court found and ruled that the defendant must come forward with evidence explicitly proving economic prejudice. But not necessarily for laches? No, Your Honor. I believe, as Judge Flager wrote in Hemstreet, there must be an explicitly proven nexus between the delay and the claim for economic prejudice. Because the whole issue here is, would RIM... How does one go about explicitly proving nexus, as you understand it, apparently? As they did in ABB Robotics, they produced internal documents showing that they actually did design a round. They actually had internal documents showing that they would have done something differently. Here, all that RIM did was produce summaries of bills for prosecuting its patents. They didn't produce any internal documents to substantiate and corroborate its claim to economic prejudice. They didn't produce their licenses. They didn't open up their files on their investigation. Well, doesn't the timing of their behavior in light of your client's alleged laches, doesn't that show a nexus in and of itself? I mean, how do you prove more than the fact that they went ahead and invested money while you slept on your rights? What more could they prove? Well, as this court held in Aukerman, if the principle is that someone just goes ahead and sells more products or invests in products during that period of time, there would be economic prejudice in every case. And that's why this court said there needs to be an explicitly proven nexus, that the behavior would have been different, the conduct would have been different, if Mahmoud had sued earlier. And there's also evidentiary evidence. Does common sense play any role in that? I mean, would it be common sense for them to have said, or for them to say, hey, if we knew you really owned this invention, we surely would not have gone ahead doing what we did. Well, Your Honor, I think there's several facts in the record that go right to that issue. In 2004, RIM conducted a thorough investigation. The record shows they spent over 100 hours on this investigation, looking at archived emails, looking at the file histories of the 699-  Exactly, Your Honor. So they proceeded as if Mahmoud's allegations had no merit to them. And then, in 2010, when RIM received a letter from counsel with documentary evidence to support his claim, RIM said, we stand by our position in 2004. Nothing was changing RIM's mind, consistent with this court's precedent. The only thing that would have changed their mind would have been an early lawsuit by you, which you won, if you could. But Your Honor, I think there's facts that go right to that point as well. Before this complaint was filed, we provided RIM with a copy of the complaint, the documentary evidence, and a claim chart, specifically matching up the elements. We met with RIM. RIM did not change anything in its conduct. In fact- But that was, depending on how you count, six or nine years later. So their behavior in 2010-11 is at least one very large temporal step removed from the inquiry, what would they have done in 2004, if sued, say, in 2004. And then there's the question, surely it would have made a difference if your client moved from the stage of sending letters, communications, to the quite different real-world stage of filing a lawsuit, when suddenly discovery is available, when there is now a credible commitment, as economists say, to getting a judge to rule. Aren't those two significant differences from your principal argument, which is they keep saying, no, it's ours, no, it's ours, no, it's ours? Well, first, Your Honor, they not only did they say, no, it's ours, but they also admitted, they had this testimony in the record where Mr. Patheil testified they did not believe they had to make any changes in their patent strategy, nor in their product. But getting to your point, Your Honor, on the lapse of time, and isn't it different when a suit is actually filed, those facts, that kind of procedural timeline, chronology, is true of every case where the issue of latches and economic prejudice is at play. And so the mere passage of time and the non-filing of the lawsuit is not enough to support a claim for latches, because every defendant who claims latches could walk into court and say, but if I had been sued, I would have completely done something differently. Well, there's evidence that RIM was given that opportunity in 2004. But there's also evidence, testimonial evidence, to be sure, but nevertheless, evidence from, I don't remember the fellow's name, but the RIM. Mr. Patheil. Yeah. Who said, in a variety of contexts, when presented with patent issues, we have taken them seriously and sometimes changed our behavior. We would have considered a variety of options that we thought about, but rejected. We would have considered them more seriously had we been sued in 2004, whether maybe a financial settlement, maybe actually co-ownership, if he had presented some of the evidence that apparently his letters said he had, but he didn't quite follow up on back in 2004. There is testimonial evidence beyond the sheer timeline that they would have done something differently. Not documentary, smoking gun kind of evidence, but evidence nevertheless. Well, in Aukerman, this court said that the burden of proof on this issue is always with the defendant who raises latches. They need to prove this, and I submit, Your Honor, they did not do that, and the findings were clearly erroneous. In ABB Robotics, the defendant in that case produced internal memoranda supporting their claim. Here, there was none of that. We have the testimony, but we also have RIM's actions, where they were given more evidence. They were given the evidence that you're talking about, but the evidence that we submitted with the complaint, they were given that evidence in 2010. Right, but there's a temporal difference does make a difference. By then, they had invested, whatever the figure is, it's non-trivial, in filing and getting issued a large number of patents in the 694 family, patents that I gather they found valuable either as enforcement tools or for licensing, and once they had done all of that, that's basically before they had done that. Well, Your Honor, they didn't produce the licenses, no documents, as I've mentioned, but that temporal aspect that you're talking about, Your Honor, is true of every situation where there's a latches defense that's being raised and the economic prejudice is being claimed. So if the law is going to be that once a person files suit, you can say, I would have done something differently, I submit, Your Honor, that that's contrary to this court's precedent. In all these cases I cited, Aukerman, Hemstreet hearing components, Myers v. Brookshue, Hemstreet, where there's an argument or there's a holding that you need to have an explicitly proven nexus, that law was lost on the district court's analysis of the factual record here. There was no testimony except for Mr. Patheel about what he would have done, but on cross-examination, he admitted that RIM would not have done anything differently because they saw no reason to. They believed inventorship was correct, they conducted an extensive investigation, and they proceeded at risk. Part of the underlying principle we're dealing with is this is an equitable doctrine of latching. And one of the things courts look at when they're dealing with the application of latches is clean hands on the part of the party claiming latches, that is, in this case, the defendant. And part of that concept is how did that party behave vis-a-vis the plaintiff, the claimant against him or her, in terms of can they tie their behavior together in such a way that we can look at that defendant and say, they did all they could have under the circumstances. And so the idea of nexus is not something, it's not like a house that you build with four walls. It's a rather flexible concept that speaks to the question of the equitable balance between the plaintiff and the defendant. And so far, everything I've heard makes them sound like they behave as a reasonable party should have under these circumstances. What more should they have done to avoid your plaintiff being hurt by a latches defense? Well, Your Honor, what RIM did is what the defendants in other cases have done. They conducted an investigation and they determined that Mr. Mood's claims had no merit. And there's no evidence that that was not a bona fide determination. Exactly, Your Honor. And we're saying that that is what their state of mind was in 2004 and 2010 and thereafter. So just as the infringer who believes, I don't infringe or your patent is invalid, that was RIM's state of mind. And they came to that conclusion based on this thorough investigation. And so in the case law, when a defendant proceeds with its own market reasons, its own business concerns, in mining the patent and building the portfolio because of what was going on in the marketplace, which is what Mr. Tathiel testified about, when they're operating in that way, when their day-to-day activities are not affected by these allegations, that is not, there's no nexus. There's no nexus between the delay and the conduct. But this also goes to, Your Honor, your point on other factors. Copying. There's evidence in this case we believe that this court did not consider. Mr. McMurtry's email acknowledged that Tahir Mahmood's page mail application solved the two-mailbox problem and was a powerful and exciting idea. In 1997, RIM submitted documents to the District Court in spots just as page mail's functionality. There's evidence here that RIM copied Mr. Mahmood's page mail software, and that evidence stands unrebutted on the record. And the District Court should have considered that evidence in the context of summary judgment and latches. Can I ask you something I'm not clear about? In what way, if any, are you using the term copying to cover something different from what's exactly in the documents? He made a claim that he contributed something to what they put in their claims and should be a co-inventor, which the District Court plainly knew that this was a case about a claim of co-inventorship, which by the legal definition has to involve something that we call collaboration, and we know there was a communication here and that he sent them something and that they knew something about what his ideas were. What does copying add to that picture, which was the fundamental premise of this whole case? Well, Your Honor, in the first instance, this is not a case of joint inventorship with respect to the 694 patent. We believe the evidence shows, based on Mr. Mahmood's contributions, that the facts would establish that he is a sole inventor of the claims in the 694 patent, that the contributions of the other RIM engineers were already known in the art. But getting to your point, I don't know if there should be a material distinction between a joint inventorship case where there's copying and a sole inventorship case where there's copying. In either situation, there is a copying and there's a use of the contributions, which shows... But you're making a point, as I understood it, that there is this equitable factor, copying, with some connotations, some nefarious connotations, that the District Court somehow missed. And what I'm not really understanding is what that is, given that the District Court unquestionably knew that what his claim was, that he had communicated with them back in 1995 or 1994, whenever it was, and that he claimed they got a really important idea from him, that the District Court knew that full well in deciding, nevertheless, that Latchey's barred the claim. Your Honor, I see I'm out of time. Your Honor, I think it boils down to this simple point. Aukerman says this evidence should be considered. It wasn't. In fact, in Gasser Chair, they made that point. So when we say that the District Court is aware of this evidence, there's no statements in the District Court's decision, there's no articulation of considering that evidence in the overall equation of the Latchey's defense. And that's the error, the simple error of just not even considering that evidence in the equation, despite the fact that the District Court was aware of that evidence. Does that answer adequately? All right, we'll save the rest of your time, and we'll have time to get into the other points. Thank you, Your Honor. Okay, let's hear from Mr. Keller. Mr. Keller, isn't Mr. Dugnoff exactly correct when he says that if this is a case of nexus, then every Latchey's case is going to have the nexus requirement met, because the only thing that seems to be evidence of nexus is that they went ahead, or you went ahead, RIM went ahead and did its thing on the basis of what it thought it should do. And there's no argument that there's economic consequences. I mean, the other two factors for Latchey's are there. But you didn't prove anything about nexus. Isn't he exactly correct in the sense that if what you show for nexus is good, then the requirement that we set out in Aukerman and Hempstead and the rest of it disappears? To answer that question, the answer is no. That is actually quite wrong, and on a variety of reasons. Those cases, which were involving patent infringement cases, bring up a different set of issues than the ones that are faced in this case. In the patent infringement context, where Latchey's is frequently pled, as why was this patent infringement case brought years after I started selling this product? In that case, the defendant in those actions had the materials in front of them that they need to assess the legal threat. They have the patent. They have the claims. They have this back in the prosecution history. To be able to evaluate as a legal matter, I have the information I need to know to be able to decide if I need to go left or am I going to go right, and I'm going to make business risks based on the legal understanding that I have with all that information at hand. In this context, we have a very different factual situation. Mr. Mahmoud, the appellant, comes to the rim out of nowhere in 2004 saying, essentially, I have a problem with your BlackBerry device. They walk, they divulge that it relates to his product called Pagemail, and Rim struggles for months to understand exactly what his claims are. At one point, it's uncertain whether it's a trade secret case. So Rim is diligent in its investigation, which it has now faulted for, of trying to figure out and work with this appellant, what is the issue that you're bringing to our attention? We understand you have materials. You told us about documents. You told us that you have them. Can you please give it to us, Rim asks. Appellant says, sure, over and over and over again, he says, sure. Rim repeatedly asks for that information. At one point, appellant doesn't respond. Rim, in frustration, says, listen, we don't understand what your claims are. We're trying to work with you. And in a letter in July 2004, sets out in great detail the correspondence between the parties, asking him to take the opportunity to actually interview Rim employees, to try to get to the bottom of it, and invites him to file a lawsuit, because they want the clarity that such a lawsuit would bring, and they'd be able to address the issues. He suggests now, well, Rim just full-heartedly plowed forward  The key problem with that argument, though, is that Mr. Mahmood was the one with the information they needed to have in order to decide what to do. And they were pleading with him to give them that information. He shows up in 2010, where the patent portfolio, as your Honor mentioned, has ballooned substantially. The financial investment in that portfolio had ballooned substantially. And he comes now with detail about what his claim is. He waits another year to file the actual lawsuit. But he finally comes in detail, long after the house, or the pasture of houses, had been built, expecting some now changing course. This is a classic case of economic prejudice, where you have an appellant who knocks on the door saying, I have a problem, and then steps back and watches as a field of houses gets built. And when the last house gets built, he says... The picture... It's always hard to translate these metaphors about how things are going to happen and whatnot. We do have a somewhat peculiar case where we're not talking about latches based on an allegation of infringement, where the question is the defendant's product that he might have redesigned. Because your claim of economic prejudice is, as I understood it, not particularly one about how you would have designed the blackberry differently. Well, I think that's wrong, Your Honor. Actually, what Mr. Patheol says in detail is... Now we understand. If we understood what was provided to us in 2010, or what the lawsuit provided us in 2011, in 2004, we had a vast array of things we could have done differently. One of them is actually design around any of the contributions that Mr. Mahmoud allegedly had provided them. That's something they could have done. Really, the... What's the label for the... I'll get my email with a single email address. The push technology, Your Honor. With the example that was used. Correct. In fact, as they demonstrated at a trial... Is there really evidence that he would have offered a blackberry product and didn't? There are actually different ways of doing that very technology. There's pushing it, as the traditional blackberry has done, and then there's pulling it and other vagaries in the claim that would allow them to have the same functionality, just through a different way. I guess I had been under the impression that, because the nature of the claim here is of co-inventorship, that your claims of economic prejudice were all about what you would have done with this creating this pool of exclusivity rights, which you could exercise by enforcing against other people, or by licensing, both of which are significantly complicated when you have a co-owner. Sure. But not that you had a... That you, I guess in the language of Latchey's Law, not just could have, not just might have, but would have done something differently with respect to the product. And Mr. Patheol testified at length about, if we had the information that the appellant eventually brings to our attention, we could have and would have made a number of changes, and we had a large assortment of options in front of us. If one, and some of the easiest ones would... He actually said would have, because maybe I want to focus more on the district court's opinion, the addendum 41 and 42. I'm not sure that the district judge ever uses the term would have. Instead, the court talks about options that, if merited, would have been explored. Language that's a lot more like might have than would have. Doesn't that fall short of the legal standard for prejudice? I think a quote of a legal standard of prejudice from Latchey's... Actually, no. Aukerman does talk about could or would have considered. So it fits perfectly within the very standard that this court has provided. What could have the defendant done, and what would... The infringer must prove that the change in economic position would not have occurred had the patentee sued earlier. Yes. And there is some language in some cases that mentions would, but there's also language in other cases that say could, and that's right that you have that language there. In this case, you have a defendant... The standard that they're setting up here, Your Honor, is that you have an appellant knock on the door, say, I have a problem, and then the rims of the world have to be putting in their files, well, if he's right, even though we don't have the information available to us to test that theory, if they happen to be right, these are the things we would do. And putting that kind of business burden on organizations when, frankly, they get knocked on the door frequently is unreasonable. And so given the passage of time that's happened here and RIM's clear effort to try to work with them to understand what the problem is so they can address it, his failure to do that, it's not surprising now that RIM comes finally getting the information it wants years later saying not only could we have done this and here are a portfolio of things and options we would have explored, but we did the exact same thing in other circumstances where other people had brought no proper amount of information. Well, suppose that the facts were true that RIM actually would have changed the technology to eliminate whatever Mr. Mahmoud's contribution was. I mean, I can imagine if that were the real world that there would be evidence of that. It doesn't seem to me unreasonable to expect that if the standard is would have, that there could be evidence. Well, except for there's a rather large fact that's missing from that fact pattern is that Mr. Mahmoud hasn't told you what he's giving you and he didn't tell RIM what he's giving him, what his claims were. And so for RIM to now postulate, well, we've got a number of patents here, is he talking about patent claims? Is he talking about copyright? Is he talking about trade secret? Now we have to put something in the file that tells us, well, if he gives us X information, we have to move to Y position, but if he gives us Z information, we have to move to A position. No, but I mean, can't you, isn't the reasoning on this point, you're starting now at the lawsuit. So we know what he says, right? In 2011? Yes, in 2011, and you asked. Well, if we had known that, if we had been told that, I know we weren't, but if we had been told that in a lawsuit in 2004, here's what we would have done. And more than we would have considered the following five possibilities. Which is, I think, pretty much all the district court ends up finding, that she relies on your witness' testimony, that there were a lot of options that we would have considered back then. Well, I appreciate Your Honor's comment on that, and a suggestion that maybe the companies of the world need to explore, but I think that puts the rims of the world in the same situation that Mr. Danio is complaining about. That now, to support Alacha's argument, to just have companies putting documents in the file at the time the lawsuit was sued about what it would have done years later, is a bit of a band-aid to the situation. It's what's the critical inquiry, and almost too easy to do, because there's no supporting evidence of what actually would have happened if the lawsuit was brought at the right time. I take it part of your argument seems to be that if there was only one option available to RIM, they might have said, this is what we would have done, whereas there were four or five different technology options that were available, and your client candidly said, I don't know which one we would have picked, but we could have picked any number of these. Is that part of your argument? That's part of the argument, but there's a rather thick layer above it, Your Honor, which was, we don't have the information that we even need to be able to assess what our options are yet. We've been told repeatedly that there's a problem, and repeatedly that there's materials in play that he's going to give us, but he fails to do so, so we can't even decide, okay, we understand the world to be one way, he's telling us a different way, but he's not telling us how. One of the things I like about modern technology is the language of it. For example, you said earlier that you could have pushed, or you do push, but now you could have pulled, and you get the same function. I have difficulty with that. If I push someone, they end up going that way, and if I pull someone, they go the opposite way, but I take your word for it since I'm not into technology. But there is a little slippage in terminology elsewhere, which is all of your responses have been keyed, if I understood you correctly, to economic prejudice. I have yet to hear the word nexus out of your mouth since my opening question, and all of that argument that you responded to, you then concluded, said, proved economic prejudice. I never thought there was a real issue on economic prejudice. You clearly have that with all of the money you spent on all of the family of patents, but I'm still puzzling as to why he's not right on whatever we mean by nexus in this context. Can you help me address that specific issue? I'd be happy to, Your Honor, and Aukerman makes clear that effectively what's happening in this latches inquiry on the nexus of the delay between economic prejudice is creating effectively a but-for world. But-for, if the claim had been brought on a timely basis, how would the world have looked? And in this case, following exactly what Aukerman has promulgated, he's looking at, okay, if the appellant had brought his later claim that he brought in 2011 and brought it in 2004, how would the world have evolved? And Mr. Patheol, the only fact witness that was provided at trial, because all of his testimony was adopted and found fully credible, at length testifies that if this information that we did not have was provided to us in 2004, these are the things we could have done to resolve these issues. Some of them involve potentially not even having the patent portfolio at all, but there are a lot of other more potentially easier ways of getting around the problem, but we would have explored those options and could have picked one of many of those to resolve them. So that's the nexus. But for the filing of it late, we could have done these things. Everything that you just said, I think you were quite careful to use the language about options and could have, would be consistent, in fact, with a finding by the district court, a finding we don't have, I admit, but a finding that said, but you haven't proved that you would have done any of them. So why is that not, in fact, the standard? I guess I'm increasingly thinking that given what the district court, the district court's language at 17-18 of the original, 41-42 of the addendum, does not reach the level of would have done something different. Is something less than that, and your arguing is that ought to be enough. That's correct, Your Honor. In this circumstance, unlike the patent infringement cases where an appellant has all the information available to them, in this case where, I'm sorry, the defendant has all their information available to them, in this case where the appellant doesn't even provide that much, doesn't provide the information for which rim to begin exploring what it would do based on this information, the could have is the necessary standard in the context of this case. You are hypothesizing that if you had done just a little bit more appellant in giving information back then, what would they have done with that information and what could they have done with that information? They certainly would have considered the information and they could have chosen from this menu of choices, but not for the fault of rim. There's something in the file that said we would have done this. It was desperate to try to find out what Mr. Mamoose claims and desperate to get the material that he repeatedly said they had. It's not their fault that said, okay, well, should we just guess and just throw out some ideas about what it may be and then guess and put in a file about what we would have done. That would be an inappropriate standard and would not be consistent with offense. Another legal question. Given that laches is an equitable doctrine, is there precedent for the notion that when you look at the two requirements, unreasonableness of delay and prejudice, that if the delay was exceedingly unreasonable that you need some sort of prejudice, but that prejudice, even if it's rather thin, as long as it's there, can be in effect. The thinness can be outweighed by the extremeness of the unreasonableness of the delay. That might be some of the undercurrents of the cases that have probably been cited to you, but I haven't seen that in actual writing yet, that there's a balancing of the two. I have nothing to offer you on that point. Okay. Thank you, Mr. Keller. Mr. Daniel. May it please the Court? Your Honor, Judge Stronto, as to your point, I think there is law on this. Mere delay under Aukerman is not enough, and despite what is... The cases are clear that you need to prove that defendant bears the burden of proof and must prove economic prejudice. But if you look at the delay here, and this was one of the issues that goes to the... Are you arguing there's no economic prejudice? Your Honor, we're arguing that there's no economic prejudice that's connected to the delay in the suit. It's the nexus issue. Exactly, Your Honor. We don't contest that Rim built this portfolio and spent money in the prosecution's portfolio. You're not arguing the abstract question of whether they suffered economic prejudice by the delay. No, what we're focusing in on is the lack of nexus because the record firmly shows that the world... Mr. Keller talked about... Are you not persuaded by Mr. Keller's argument? No, I'm not, Your Honor. Mr. Keller talks about a but-for world, and what would this world have looked like? Well, there would have been no difference. That's the point about the fact that there's no economic prejudice here. There would have been no difference. One of the options that Rim had, which they took against NTP, was to litigate the case because Rim testified at page 17 of our brief. Mr. Patheel said, we started looking at the 694 patent because a single mailbox was one of the issues that we needed to look into. They knew what was at issue. Are you saying that they should have filed suit in 2004 or 2001 against Mr. Mahmoud? Well, that would have been one option, Your Honor. We're not saying they should have done that. To what? To quiet title? Or when he didn't respond to what looks from the record like an attempted dialogue? Your Honor, that would have been one option to them. But there was a dialogue, and the dialogue ended with Rim saying in no uncertain terms through the testimony and letters to Mahmoud that your allegations have no merit. That was 2004, and this is my problem with the silence is I understand the difference between laches and estoppel is that laches can result from silence if it's long enough, let's say seven years, whereas if you are showing that you've been prejudiced and therefore there's an estoppel against bringing the action, that could arise based on a showing of economic prejudice. And it does seem when you read the district court's decision that this prolonged silence, prolonged for no reason that I think anybody can find credible, that my records were in my brother's garage and I couldn't find them for seven years is curious, to put it mildly. Where does that leave us? Your Honor, the factual record shows that Mr. Mahmoud couldn't locate that evidence from 2004 to 2008. In 2008, he took immediate steps to find counsel, went from Harrison, Goodert and Foote to Bird and Bird to Stevens and Bolton and to present counsel in 2010. When he found that evidence, the factual record shows he took the immediate steps to bring this claim to issue. But that's obviously what troubled the district court. There it was in the family in a box and he couldn't find it until all of these steps had been taken, the production of the BlackBerry and all else. Your Honor, he found that box in the context of winding down a business when he was legally required to search for documents relating to his business and he found a box in this attic that was labeled RIM RAM. That is what Mr. Mahmoud stated in his sworn declaration. Those facts should not have been construed against Mr. Mahmoud in the context of the unreasonable delay issue. But more importantly, Your Honor, I think that as to economic prejudice, the fact that RIM is saying we didn't know enough, that is belied by the record. They knew that interventorship was at issue. They conducted a thorough investigation, lab notebooks, archive emails. They interviewed witnesses. They determined that his allegations had no merit and just like in the NTP case where they litigated against NTP for years, that was their position against Mr. Mahmoud. In the but-for world, RIM would not have acted any differently if Mr. Mahmoud had filed suit earlier. Okay. All right. So let's say that that concludes the argument for the first case.